1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DESIREE MURILLO,

11           Plaintiff,                    No. 2:09-cv-03117 KJN

12       v.

13   CITY OF WOODLAND; RYAN
     PIERCY; CASEY SULLIVAN;
14   and DOES 1 to 40, Inclusive,

15           Defendants.              ORDER
     _____/
16

17           In this action, plaintiff alleges claims pursuant to 42 U.S.C. § 1983 and California

18   state law against defendant City of Woodland ("the City") and a former officer of the Woodland

19   Police Department, defendant Ryan Piercy, in connection with Piercy's allegedly unconstitutional

20   pat-down search of plaintiff during a traffic stop.  Only plaintiff's Section 1983 claims are at

21   issue in the motions for partial summary judgment presently before the court.[1]  Briefly stated,

22   plaintiff alleges that Piercy searched her in violation of her constitutional rights, and did so in a

23   sexually aggressive and unconstitutional manner.  Additionally, plaintiff alleges that the City is

24   _____

25           [1] This action proceeds before the undersigned as a result of the parties' voluntary consent
     to the jurisdiction of a United States Magistrate Judge (Dkt. Nos. 13, 14, 35).  See 28 U.S.C.
26   § 636(c)(1); Fed. R. Civ. P. 73; E. Dist. Local Rule 301.

liable for the alleged violations of plaintiff's constitutional rights.

Presently before the court is the City's Motion for Summary Adjudication filed pursuant to Federal Rule of Civil Procedure 56, which seeks the dismissal of plaintiff's Section 1983 claim or claims alleged against the City.[2]  (Mot. for Summ. Adjudication, Dkt. No. 52.)  Piercy filed a notice of joinder in the City's motion, which does not specify the claim or claims to which it is directed.[3]  (See Joinder in Mot. for Summ. Adjudication, Dkt. No. 62.)  Nevertheless, the court construes Piercy's joinder as seeking partial summary judgment as to plaintiff's first claim for relief, which is the only Section 1983 claim alleged against Piercy.

The court heard this matter on its law and motion calendar on May 11, 2011. (Minutes, Dkt. No. 81.)  Attorney Carolee G. Kilduff appeared on behalf of the City, and attorney John A. Lavra appeared on behalf of Piercy.  Attorney Jeffrey D. Janoff appeared on behalf of plaintiff.

The undersigned has fully considered the parties' submissions, oral arguments, and appropriate portions of the record in this case and, for the reasons that follow, grants the City's and Piercy's motions in part, and denies those motions in part.  Specifically, the court grants partial summary judgment to the City and Piercy to the extent that plaintiff claims that Piercy: (1) stopped plaintiff's vehicle in violation of plaintiff's constitutional rights, (2) ordered plaintiff out of her vehicle in violation of plaintiff's constitutional rights, (3) used excessive force

---

[2]  The City's motion is often referred to herein as a motion for partial summary judgment. The subdivision caption to Federal Rule of Civil Procedure 56(a) reads "Motion for Summary Judgment or Partial Summary Judgment," and the Advisory Committee Notes to the 2010 Amendments to Rule 56(a) state that this "subdivision caption adopts the common phrase 'partial summary judgment' to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion."

[3]  Piercy filed a notice of joinder in the City's motion for partial summary judgment, and the City seeks judgment as to plaintiff's second claim for relief.  However, the second claim for relief is alleged only against the City.  To the extent that Piercy intended to move for partial summary judgment as to the Section 1983 claim asserted against him, i.e., plaintiff's *first* claim for relief (see First Am. Compl. ¶¶ 7-17, Dkt. No. 19), Piercy's notice of joinder evidences no such intent.

on plaintiff in violation of plaintiff's Fourth Amendment rights, and (4) violated plaintiff's substantive due process rights guaranteed by the Fourteenth Amendment.  However, the court denies Piercy's motion for partial summary judgment to the extent that it challenges plaintiff's claims that: (a) Piercy unconstitutionally conducted a pat-down search of plaintiff under Terry v. Ohio, 392 U.S. 1, 21 (1968), without a proper legal basis to conduct the search at all, and (b) searched plaintiff in an unconstitutional manner.  The court denies the City's motion to the extent that it challenges plaintiff's claim that the City is liable for Piercy's pat-down search of plaintiff under Terry, but grants partial summary judgment to the City to the extent that plaintiff alleges that the City is liable for the manner of the pat-down search itself.

I.      BACKGROUND

     A.      Factual Background

          1.      Piercy's Training at the Butte College Police Academy and the Woodland Police Department[4]

It is undisputed that the Woodland Police Department hired Piercy in June 2008. (City's Statement of Undisputed Facts ("City's SUF") ¶ 1; Pl.'s Statement of Disputed Facts ("Pl.'s SDF") ¶ 1.)  It is also undisputed that prior to being hired by the Woodland Police Department, Piercy completed a training program at the Butte College Police Academy and obtained a certificate in basic Peace Officer Standards and Training.  (City's SUF ¶ 2.)  Piercy attended this training program for approximately six months, and Piercy finished tenth in his class.[5]  (Id.)  Plaintiff only disputes these facts on the grounds that training officers and other

---

[4] Piercy's training relative to conducting pat-down searches is relevant to the City's potential liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). Although the parties dispute the nature of Piercy's training at the police academy and with the Woodland Police Department, most of plaintiff's statements of disputed facts rely on the non-responsive, boilerplate statement that "[n]o written manual was ever produced" on certain topics. (See Pl.'s SDF ¶¶ 3-5, 7-8.)

[5] The record does not contain evidence substantiating what specific training Piercy received at the Butte College Police Academy, or the substance of the Peace Officer Standards

1  officers criticized Piercy's performance (Pl.'s SDF ¶ 2); plaintiff's response does not directly

2  address the facts asserted by the City or create a genuine dispute of material fact.

3        While at the Butte College Police Academy, Piercy was taught to use the palm of

4  his hand for the majority of pat-down searches.[6] (City's SUF ¶ 3.)  Piercy was taught to use the

5  palm of his hand in order to determine whether a person had a weapon.  (City's SUF ¶ 4.)

6  Plaintiff does not genuinely dispute these facts; she only asserts that "[n]o written manual was

7  ever produced on this issue."  (Pl.'s SDF ¶¶ 3-4.)  There is no genuine factual dispute that Piercy

8  was taught that he should not put the palm of his hand across a woman's chest; however, it is

9  unclear whether that training was provided by the Butte College Police Academy in addition to

10  the Woodland Police Academy.  (See City's SUF ¶ 5; Pl.'s SDF ¶ 5.)

11        Piercy completed orientation training and approximately 16 weeks of field

12  training with the Woodland Police Department prior to his assignment to patrol.  (City's SUF

13  ¶ 6; Pl.'s SDF ¶ 6.)  During this orientation and training, Piercy received training on how to

14  perform pat-down searches.  (City's SUF ¶ 7.)  Officers with the Woodland Police Department

15  are trained to use the back and blade of the hand when searching females' breast and buttock

16  areas.  (Id. ¶ 8.)  "[W]hen an officer searches the area under the breasts, the blade section of the

17  hand (fingers up, thumb against the body) sweeps along the bra line and the back of the hand is

18  used on the buttocks."  (Id.)  Again, plaintiff only disputes these facts on the non-responsive

19  ground that "[n]o written manual was ever produced on this issue."  (Pl.'s SDF ¶¶ 7, 8.)

20        The record is relatively silent regarding the Woodland Police Department's

21  policies or training addressing when a pat-down search should be conducted.  In this vein, the

22  City's statement of undisputed facts states: "For the safety of the Officer, the decision to do a pat

23

24  and Training course.

25     [6] Piercy testified that he was taught to use the palm technique in conducting pat-down
searches, but was also taught to use the back of his hand and the blade of his hand.  (Piercy Depo.

26  at 22:22-23:4.)

1    down search during a traffic stop is at their discretion."  (City's SUF ¶ 12.)

2            The City offers as an undisputed fact that "[d]uring training Piercy demonstrated

3    competency in the area of officer tactics, including pat down searches," and relies on the

4    declaration of Lieutenant Anthony Cucchi[7] in support of this fact.  (City's SUF ¶ 10 (citing

5    Cucchi Decl. ¶ 7).)  Plaintiff disputes this fact on two grounds.  First, plaintiff argues that

6    "Cucchi was not [Piercy's Field Training Officer] and was not involved in [Piercy's] training so

7    he has no personal knowledge of this fact."  (Pl.'s SDF ¶ 10.)  Second, plaintiff disputes this fact

8    on the basis of the expert declaration of David A. Dusenbery, who was retained by plaintiff as a

9    "police practices consultant and expert witness" and concluded upon review of the records

10   provided to him that Piercy "should not have been hired by the Woodland Police Department and

11   he should have been terminated during the field training program."  (See Dusenbery Decl. at 1, 3,

12   Exhibit D to Pl.'s Opp'n, Dkt. No. 64, Doc. No. 64-4.)  The City replies that the fact regarding

13   Piercy's competency remains undisputed because: (1) Lieutenant Cucchi was aware that Piercy

14   demonstrated competence or else Piercy would not have been passed through the Field Training

15   Program; (2) Lieutenant Cucchi was aware of Piercy's competence from reviewing unidentified

16   "training and personnel documents produced in this case"; and (3) Dusenbery's conclusion is

17   "irrelevant argument rather than evidentiary fact and is based at least partially if not completely

18   on inadmissible hearsay and on speculation with the benefit of hindsight.  Fed. R. Civ. P. 56(e);

19   Fed. R. Evid. 602, 805."  (City's Reply Statement of Undisputed Facts ¶ 10, Dkt. No. 79.)

20           In regards to Dusenbery's expert declaration, the court finds that Dusenbery's

21   declaration is of such a conclusory nature, offering no explanation or bases for the opinions

22

23           [7] It is unclear from Lieutenant Cucchi's declaration exactly what function he served in
     the Woodland Police Department, other than that he investigated Piercy's traffic stops after
24   receiving an "inquiry from a citizen."  (Cucchi Decl. ¶ 18.)  However, Lieutenant Cucchi testified
     in his deposition that at the time of the events in question, he was a sergeant in the "professional
25   standards department" of the Woodland Police Department.  (Cucchi Depo. at 4:18-5:8.)  He was
     also Piercy's supervisor at the time of the incident.  (Id. at 66:19-21.)  At the hearing, counsel for
26   the City clarified that Lieutenant Cucchi was promoted from the rank of sergeant.

                                                      5

offered, that it is given no material weight in the context of the City's and Piercy's motions for partial summary judgment.  See Clouthier v. County of Contra Costa, 591 F.3d 1232, 1252 (9th Cir. 2010) (finding, in the context of a Section 1983 action, that no material evidence on issue of County's knowledge or the obviousness of a problem despite expert declaration on issue because the expert's opinions were conclusory) (citing Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.")).

In regards to Lieutenant Cucchi's statement, plaintiff has created a legitimate factual dispute.  Lieutenant Cucchi has no personal knowledge of Piercy's competence in performing pat-down searches during field training, and the City has not cited any evidence that would support substantiate Lieutenant Cucchi's personal knowledge in this regard.  Accordingly, the court concludes that a genuine dispute of fact exists as to Piercy's competency in performing pat-down searches during field training.  Whether this factual dispute is material is a separate question addressed below, in the portion of this order addressing the City's potential Monell liability.

Piercy completed the Woodland Police Department's field training program on October 24, 2008.  (City's SUF ¶ 9; Pl.'s SDF ¶ 9.)  Thereafter, Piercy was assigned to a patrol in a solo unit.  (City's SUF ¶ 9; Pl.'s SDF ¶ 9.)

2.      The Traffic Stop and Piercy's Pat-Down Search of Plaintiff

It is undisputed that Piercy was a police officer employed by the City's police department, the Woodland Police Department, at the time of the traffic stop at issue in this case. (See City's SUF ¶¶ 1, 9, 13; Pl.'s SDF ¶¶ 1, 9, 13.)  During the events in question, Piercy was assigned to a patrol in a solo unit on the "graveyard shift."  (See City's SUF ¶ 9; Pl.'s SDF ¶ 9.)

On February 1, 2009, Piercy conducted a traffic stop involving plaintiff.  (City's SUF ¶ 13; Pl.'s SDF ¶ 13.)  Piercy's patrol vehicle is equipped with a camera mounted to the windshield, and that camera visually recorded the traffic stop.  The City lodged the recording

1   with the court.  (See Cucchi Decl. ¶ 11 & Ex. A, Dkt. No. 55; Notice of Lodging CD, Dkt.

2   No. 57.)  Notably, however, the recording does not contain any of the relevant audio from the

3   traffic stop, such as what was said between plaintiff and Piercy during the stop, because Piercy's

4   civilian radio was playing loud music during the entire traffic stop.

5           Plaintiff testified at her deposition that on the night in question, she had been at a

6   bar with her aunt and had consumed one sip of beer before she learned that her daughter was at

7   home with plaintiff's grandmother and was crying, which prompted plaintiff to leave the bar.

8   (See Murillo Depo. at 67:12-68:15.)  Plaintiff testified that she had arrived at the bar at around

9   11:45 p.m. or 11:50 p.m., and left after approximately ten to fifteen minutes.  (Id.)  She further

10  testified that she noticed a patrol vehicle, which turned out to be Peircy's patrol vehicle, driving

11  down a main street when she walked out of the bar.  (Id. at 69:19-70:7.)

12          The video recording begins as Piercy makes a left turn at an intersection with a

13  traffic signal, and shows Piercy following plaintiff's vehicle.  (See Video at 00:04:12.)  Piercy

14  turned on his overhead lights after plaintiff made a right turn at an intersection with a stop sign.

15  (Id. at 00:04:30.)  According to the time stamp on the video recording, Piercy stopped plaintiff's

16  vehicle at approximately 12:04 a.m.  (Video at 00:04:40; Cucchi Decl. ¶ 10.)  Notably, although

17  the City's statement of undisputed facts states that Piercy stopped plaintiff "after observing

18  [plaintiff] make a traffic violation" and relies on the declaration of Lieutenant Cucchi to support

19  that fact, Lieutenant Cucchi's declaration only states that "Piercy conducted a traffic stop on

20  Desiree Murillo," with no mention of the basis for the stop.  (Compare City's SUF ¶ 13, with

21  Cucchi Decl. ¶ 10.)  However, Piercy testified that he stopped plaintiff for passing over the limit

22  line when plaintiff stopped at the stop sign and made a right turn, and plaintiff testified that this

23  was the basis of the traffic stop that Piercy provided to her.[8]  (Piercy Depo. at 7:23-8:1; Murillo

24

25          [8]  Under California law, a "limit line" is defined as "a solid white line not less than 12 nor
    more than 24 inches wide, extending across a roadway or any portion thereof to indicate the point
26  at which traffic is required to stop in compliance with legal requirements."  Cal. Veh. Code

7

1   Depo. at 105:9-14, 244:15-22.)  Neither party disputed in their papers or at the hearing that this

2   was the basis for the traffic stop.[9]

3           After stopping plaintiff's vehicle, Piercy stood at plaintiff's driver's side window

4   for approximately 30 seconds, speaking to plaintiff and shining his flashlight into the vehicle.

5   (Video at 00:05:09-00:05:45.)  Plaintiff testified that Piercy asked her where she was coming

6   from, and that she responded that she was coming from a bar and was going to her grandmother's

7   home because her daughter was crying.  (Murillo Depo. at 77:1-9.)  Plaintiff also testified that

8   Piercy asked her whether she had been drinking, and that she responded that she had consumed

9   one sip of beer.  (Id. at 77:9-10.)  Piercy testified that plaintiff "admitted to drinking" alcohol, but

10  could not recall the specific response provided by plaintiff.  (Piercy Depo. at 7:18, 11:24-12:10.)

11          Piercy then ordered plaintiff to exit the vehicle (City's SUF ¶ 16; Pl.'s SDF ¶ 16),

12  and move to the sidewalk (Video at 00:05:52.)  Piercy testified that he asked plaintiff to exit the

13  vehicle because she had admitted drinking alcohol.  (Piercy Depo. at 79:14-18.)

14          The parties agree, and the video recording substantiates, that plaintiff was wearing

15  jeans and a sweater; plaintiff reasonably characterizes her jeans as having been "tight," in

16  reliance on the video recording and Lieutenant Cucchi's deposition.  (Pl.'s SDF ¶ 17; Cucchi

17  Depo. at 77:5-7.)

18          After plaintiff handed Piercy what appears to be a driver's license, Piercy ordered

19  plaintiff to turn around so that she was facing away from him.  (Video at 00:05:58.)  Plaintiff

20  _____

21  § 377.  California Vehicle Code § 22450(a) provides that "[t]he driver of any vehicle
    approaching a stop sign at the entrance to, or within, an intersection shall stop at a limit line,

22  if marked, otherwise before entering the crosswalk on the near side of the intersection. . . .  If
    there is no limit line or crosswalk, the driver shall stop at the entrance to the intersecting

23  roadway."  A violation of Section 22450(a) constitutes an infraction.  See Cal. Veh. Code
    § 40000.1 ("Except as otherwise provided in this article, it is unlawful and constitutes an

24  infraction for any person to violate, or fail to comply with any provision of this code, or any local
    ordinance adopted pursuant to this code.").

25

26  [9]  Piercy further testified that "[r]olling to the stop sign could lead me to believe that she
    was DUI."  (Piercy Depo. at 104:4-5.)

testified that Piercy told her he was going to search her. (Murillo Depo. at 85:4-10.) Neither party contends that plaintiff consented to a search of her person. Piercy then ordered plaintiff to spread her feet apart, clasp her hands, and place them over her head, and Piercy placed his hand on plaintiff's clasped hands. (Video at 00:06:00; see also Murillo Depo. at 85:8-20; Piercy Depo. at 113:8-13.)

Piercy then conducted the pat-down search of plaintiff that is at the center of this dispute. (City's SUF ¶ 18; Pl.'s SDF ¶ 18; Video at 00:06:02-00:06:15.) Piercy appears to use the palm of his hand while conducting the entire pat-down search of plaintiff. (Video at 00:06:02-00:06:15.) The video recording shows that Piercy first ran the palm of his hand along plaintiff's right hip and down the outside of plaintiff's right leg to about plaintiff's knee. The recording then appears to show that Piercy then ran the palm of his hand upward along plaintiff's right, inner thigh from the back of plaintiff's knee and into her crotch and vaginal area, pushed plaintiff's right buttock upward with the palm of his hand, and ran the palm of his hand over part of the right, rear pocket of plaintiff's jeans. Piercy repeated this sequence on plaintiff's left hip, leg, inner thigh, crotch, and buttock.

Plaintiff described Piercy's use of his hands as "rubbing," not patting, that Piercy used force, and that Piercy "pushed [her] butt cheek up and felt [her] butt," but that Piercy's hand never stopped moving to grab plaintiff's buttocks. (See Murillo Depo. at 90:12-91:8, 92:6-21.) She further testified that the pressure of Piercy's hand increased when Piercy was touching her buttocks. (Id. at 95:7-13.) Plaintiff also testified that Piercy's thumb touched her vaginal area and that her internal reaction was: "What the hell is this guy doing to me?" (Id. at 92:24-93:10.)

While reviewing the video recording of the traffic stop and pat-down search during his deposition, however, Piercy disagreed with plaintiff's counsel's characterizations that Piercy placed the palm of his hand between plaintiff's legs and that Piercy used force to lift plaintiff's buttocks. (See Piercy Depo. at 114:2-116:17.)

Piercy then reached around plaintiff's waist and began searching plaintiff's

1  stomach and chest areas; plaintiff reacted by turning around, facing Piercy, and saying

2  something.  (Video at 00:06:07-00:06:09.)  The video recording does not clearly show the

3  manner in which Piercy searched plaintiff's stomach and chest areas.  Insofar as the search of her

4  stomach and breasts was concerned, plaintiff testified at her deposition as follows:

5           Q.  After he did the left leg, what portion of his body -- or your body did
             he next touch?

6

7           A.  Then he touched my breast, and then he felt my stomach.  And after he
             rubbed my stomach inappropriately, that's when I turned around and told
             him that I didn't feel that he was searching me the correct way and that I

8           was really uncomfortable and that I didn't think that he should be touching
             me that way.

9

10  (Murillo Depo. at 95:14-21.)  She further testified:

11          Q.  Where on your breast did his left hand touch?

12          A.  The front of my breast, both breasts.  He ran his hand over both of my
             breasts.

13
             Q.  Did he ever stop the movement of his hand?
14
             A.  No.
15
             Q.  Was his hand open or could you describe the position of his hand?
16
             A.  His hand was open and it was the palm of his hand.
17
             Q.  Did he ever press on your breasts?
18
             A.  Yes.
19
             Q.  Did he ever grope your breasts?
20
             A.  No.
21
             . . .
22
             A.  He felt them.
23
             Q.  Did he ever grope your breasts?
24
             A.  What do you mean by "grope"?  Like did he squeeze them?
25
             Q.  Did he ever grab them?
26

10

A.  No.

Q.  . . . And your testimony is he pressed on your breasts?

A.  Yes.

Q.  And what portion of your body did he next touch?

A.  My stomach area.

Q.  Will you describe how he did that?

A.  He ran his hand kind of in a wavelike position across my stomach, like he waved his hand across like my stomach, and that's when I turned around and told him that I didn't think that was an appropriate way for him to be touching me.

Q.  You turned around to tell him that?

A.  Yes.

Q.  Did he have any response?

A.  He said, "Ma'am, you're not supposed to be moving.  I'll put you on the floor and search you that way."

Q.  What happened next?

A.  I told him that I had never been searched before, and I felt really uncomfortable, and I didn't think that was the right way that he should be touching me.  And I said, "You know, I'm pretty sure that this isn't the correct procedure."  I said, "I just feel really uncomfortable."  And then he said that it was against the law to move when an officer is searching you.  And then I said, "Okay, but, you know, I feel really uncomfortable and, you know, I didn't mean to move or whatever, but I just don't feel comfortable."

(Id. at 97:2-99:3.)[10]

_____

[10]  When asked what was so offensive about the touching of plaintiff's stomach and breasts, plaintiff testified as follows:

Q.  What was it about that that was so offensive to you?

A.  It wasn't just a straight feel across my stomach, he like waved his hand like in a wave motion across my stomach that I felt wasn't appropriate, like he was just feeling my whole stomach area.

1   Piercy testified at his deposition that he recalled that plaintiff had asked a question

2   or made a comment about his search technique, but could not recall the substance of plaintiff's

3   question or comment.  (Piercy Depo. at 117:18-24.)  He also could not recall telling plaintiff that

4   he "could put her down on the ground and search if she'd like." (Id. at 117:25-118:2.)

5   After Piercy ordered plaintiff to again face away from him, Piercy continued his

6   search of plaintiff.  (See Video at 00:06:09-00:06:10.)  Piercy next ran the palm of his hand along

7   the right and left sides of plaintiff's stomach, rib-cage area, and upper hips.  (Id. at 00:06:11-

8   00:06:15.)  After Piercy completed his pat-down search, plaintiff then turned and faced Piercy.

9   Next, Piercy used his flashlight to conduct a nystagmus test to determine whether

10   plaintiff was driving under the influence.[11]  (Piercy Depo. at 119:17-25; see also Video at

11   00:06:25-00:07:18.)  Piercy determined that plaintiff was not driving under the influence of

12   alcohol after performing this preliminary test on plaintiff.  (City's SUF ¶ 22; Pl.'s SDF ¶ 21.)

13   The video recording shows that approximately 20 seconds after Piercy concluded the Nystagmus

14   test, Piercy handed what appears to be plaintiff's driver's license to plaintiff and then continued

15   speaking with plaintiff.  (Video at 00:07:18-00:09:09.)  Piercy ultimately allowed plaintiff to

16   return to her vehicle, without issuing a ticket, and plaintiff drove away from the scene at

17

18

19

20

Q.  And that was more offensive than him touching your breasts?

21   A.  No.  But by that time after he had already rubbed my butt and touched
    my vaginal area, by the time he got to my stomach, I thought to myself,
22   You better say something because who knows what he's going to do to
    you next.  If you don't say anything, he's going to think maybe you liked it
    and so he's going to do something else to you.

23

(Murillo Depo. at 191:10-24.)

24

25   [11]  Nystagmus testing is a type of field sobriety testing that measures involuntary eye
    movements as a sign of potential intoxication.  See, e.g., United States v. Stanton, 501 F.3d 1093,
    1095 (9th Cir. 2007); Volk v. United States, 57 F. Supp. 2d 888, 891 (N.D. Cal. 1999); People v.
26   Leahy, 8 Cal. 4th 587, 591-92, 882 P.2d 321, 323 (1994).

1   approximately 12:09 a.m.[12]  (Video at 00:09:09.)

2                3.      Piercy's Release From the Woodland Police Department

3                It is undisputed that as a result of "an inquiry from a citizen," and while Piercy

4   was still on probation, the Woodland Police Department conducted an investigation into Piercy's

5   traffic stops.  (City's SUF ¶ 23; Pl.'s SDF ¶ 22.)  Lieutenant Cucchi was tasked with conducting

6   the investigation.  (City's SUF ¶ 23; Pl.'s SDF ¶ 22.)  Lieutenant Charles Wilts supervised

7   Lieutenant Cucchi, who was a sergeant at the time, and also participated in the investigation.

8   (See Wilts Depo. at 9:9-10:6, 16:16-17:24.)

9                Documents filed under seal in this case reveal that Piercy conducted traffic stops

10  and pat-down searches of two women other than plaintiff, both of whom reported to the

11  Woodland Police Department that Piercy had made them feel uncomfortable.

12               As part of the investigation, Lieutenant Cucchi contacted plaintiff.  (City's SUF

13  ¶ 24; Pl.'s SDF ¶ 23.)  Plaintiff filed a complaint with the Woodland Police Department

14  regarding the pat-down search after she was contacted by Lieutenant Cucchi in May 2009

15  regarding the search.  (See City's SUF ¶ 26; Pl.'s SDF ¶ 25; see also Cucchi Depo. at 90:15-

16  91:17.)

17               Piercy was "released" from the Woodland Police Department in June 2009

18  "because it was determined by Chief Sullivan that he did not meet the standards of the

19  Department."  (City's SUF ¶ 24; Pl.'s SDF ¶ 23.)

20        B.     Procedural History

21               Plaintiff's First Amended Complaint is the operative complaint.  In it, plaintiff

22  alleges that at all relevant times the City was "a general law city and political subdivision of the

23

24        [12]  The City notes that at several points during the traffic stop, plaintiff appears to smile or
      giggle.  (See Video at 00:07:18, 00:07:55, 00:08:35, 00:08:57; see also Murillo Depo. at 243:12-
25  22.)  Whether plaintiff smiled or laughed during the traffic stop is not material to the resolution
      of the pending motions.  Accordingly, facts pertaining to plaintiff's demeanor in this regard are
26  not discussed here.

1  State of California" that "own[ed], control[led], maintain[ed] and operate[d] a municipal police

2  department." (First Am. Compl. ¶ 4.)  She further alleges that Piercy was at all relevant times a

3  police officer with the City's police department.  (Id. ¶ 5.)

4          In plaintiff's first claim for relief, plaintiff alleges that on or around February 1,

5  2009, Piercy, acting under color of state law, performed a traffic stop of plaintiff.  (First Am.

6  Compl. ¶ 9.)  Plaintiff alleges that Piercy "unlawfully and wrongfully assaulted plaintiff in a

7  sexual manner and applied physical force to her person" in violation of plaintiff's rights under

8  the Fourth and Fourteenth Amendments to the United States Constitution, and without plaintiff's

9  consent.  (See id. ¶¶ 10, 11, 15.)  Plaintiff's first claim is alleged only against Piercy.

10         Plaintiff's second claim for relief alleges that the City violated plaintiff's right to

11  be free from unreasonable searches and to have due process as provided under the Fourth and

12  Fourteenth Amendments to the United States Constitution.  (See First Am. Compl. ¶ 22.)  This

13  Section 1983 claim, alleged only against the City, is premised on plaintiff's allegations that in

14  violating plaintiff's constitutional rights, Piercy acted pursuant to a policy, practice, or custom

15  that was created, adopted, instituted or maintained by the City.  (See id. ¶¶ 19-20.)  Specifically,

16  plaintiff alleges that the City had a policy of: (1) "failing to educate and train its police officers,

17  including PIERCY, in the proper use of force against detainees and to avoid offensive contact

18  during a pat down search by an officer of the opposite gender"; and (2) "failing to budget enough

19  funds to provide [the City's] police officers with training and education in the proper use of force

20  against detainees and to avoid offensive contact during a pat down search by an officer of the

21  opposite gender."  (Id. ¶¶ 19, 21.)

22         On April 7, 2011, the City filed its Motion for Summary Adjudication.  As noted

23  above, Piercy filed a notice of joinder in the City's Motion for Summary Adjudication, which the

24  court construes as seeking a judgment as to plaintiff's first claim for relief.  Plaintiff did not file

25  an objection to Piercy's notice of joinder.

26  ////

II.   LEGAL STANDARDS

   A.   Standards Governing Motions for Summary Judgment/Partial Summary Judgment

      Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought."  It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[13]  A shifting burden of proof governs motions for summary judgment under Rule 56.  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

      If the moving party meets its initial responsibility, the opposing party must establish that a genuine dispute as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary

---

   [13]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

judgment, the opposing party must demonstrate the existence of a factual dispute that is both material, i.e., it affects the outcome of the claim under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248). A party opposing summary judgment must support the assertion that a genuine dispute of material fact exists by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[14]  Fed. R. Civ. P. 56(c)(1)(A)-(B). However, the opposing party "must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts placed before the court must be viewed in a light most favorable to the opposing party. See Matsushita, 475 U.S. at 587; In re Oracle Corp. Sec. Litig., 627 F.3d at 387. However, to demonstrate a genuine factual dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

////

---

[14]  "The court need consider only the cited materials, but may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Moreover, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

1    B.    Standards Governing Claims Brought Pursuant to 42 U.S.C. § 1983

2           Plaintiff alleges violations of her constitutional rights.  Such claims may be

3    properly brought pursuant to 42 U.S.C. § 1983, which provides, in relevant part:

4           Every person who, under color of any statute, ordinance, regulation,
            custom, or usage, of any State . . . , subjects, or causes to be subjected, any
5           citizen of the United States or other person within the jurisdiction thereof
            to the deprivation of any rights, privileges, or immunities secured by the
6           Constitution and laws, shall be liable to the party injured in an action at
            law, suit in equity, or other proper proceeding for redress . . . .
7

8           Generally, with respect to individual defendants, "Section 1983 imposes civil

9    liability upon an individual who under color of state law subjects or causes, any citizen of the

10   United States to the deprivation of any rights, privileges or immunities secured by the

11   Constitution and laws."  Franklin v. Fox, 312 F.3d 423, 444 (9th Cir. 2002) (citing 42 U.S.C.

12   § 1983).  "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a

13   right secured by the Constitution or laws of the United States was violated, and (2) that the

14   alleged violation was committed by a person acting under the color of State law."  Long v.

15   County of L.A., 442 F.3d 1178, 1185 (9th Cir. 2006) (citing West v. Atkins, 487 U.S. 42, 48

16   (1988)).

17          A municipality may also be held liable for civil rights violations under Section

18   1983, but the standards governing the liability of a municipality materially differ from those that

19   govern the liability of individuals who acted under color of state law.  Relevant here, in Monell

20   v. Department of Social Services, 436 U.S. 658, the Supreme Court limited municipal liability

21   and held that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in

22   other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."

23   Id. at 691.  Instead, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary,

24   declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional

25   implements or executes a policy statement, ordinance, regulation, or decision officially adopted

26   and promulgated by that body's officers."  Id. at 690 (footnote omitted).  The Court further stated

17

1    that "it is when execution of a [local] government's policy or custom, whether made by its

2    lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

3    the injury that the government as an entity is responsible under § 1983." Id. at 693; see also Bd.

4    of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 403 (1997) ("[W]e have

5    required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a

6    municipal 'policy' or 'custom' that caused the plaintiff's injury.").

7         The Ninth Circuit Court of Appeals has held that in order to establish municipal

8    liability, "the plaintiff must establish: (1) that he [or she] possessed a constitutional right of

9    which he [or she] was deprived; (2) that the municipality had a policy; (3) that this policy

10   amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy

11   was the moving force behind the constitutional violation." Miranda v. City of Cornelius, 429

12   F.3d 858, 868 (9th Cir. 2005) (citation and quotation marks omitted, modification in original);

13   see also Levine v. City of Alameda, 525 F.3d 903, 907 (9th Cir. 2008) ("To establish [municipal]

14   liability, a plaintiff must establish that he was deprived of a constitutional right and that the city

15   had a policy, practice, or custom which amounted to 'deliberate indifference' to the constitutional

16   right and was the 'moving force' behind the constitutional violation.") (citing Van Ort v. Estate

17   of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996), cert. denied, 519 U.S. 1111 (1997)).  With

18   respect to the last element, "[t]here must be a direct causal link between a municipal policy or

19   custom and the alleged constitutional deprivation."  Villegas v. Gilroy Garlic Festival Ass'n, 541

20   F.3d 950, 957 (9th Cir. 2008) (en banc) (citation and quotation marks omitted).  Additionally, the

21   Court of Appeals has recognized that in addition to showing that a constitutional violation

22   resulted from an express municipal policy or custom, "[a] plaintiff may also establish municipal

23   liability by demonstrating that (1) the constitutional tort was the result of a longstanding practice

24   or custom which constitutes the standard operating procedure of the local government entity;

25   (2) the tortfeasor was an official whose acts fairly represent official policy such that the

26   challenged action constituted official policy; or (3) an official with final policy-making authority

18

1   delegated that authority to, or ratified the decision of, a subordinate." Price v. Sery, 513 F.3d

2   962, 966 (9th Cir. 2008) (citation and quotation marks omitted).

3   III.   DISCUSSION

4          Plaintiff has alleged Section 1983 claims against an individual defendant and a

5   municipal defendant.  The City moves for partial summary judgment as to plaintiff's Section

6   1983 claims on the grounds that: (1) plaintiff cannot show that her constitutional rights were

7   violated; and (2) even if plaintiff could demonstrate a constitutional violation, plaintiff cannot

8   show that a policy, practice, or custom was the moving force behind the violation.  (See City's

9   Memo. of P. & A. In Supp. of Mot. for Summ. Adjudication ("City's Memo.") at 4, 8.)  Piercy

10  joins in the City's first argument.  Because of the analytical overlap, the court addresses the

11  claims asserted against the City and Piercy together insofar as the allegations of constitutional

12  violations are concerned.  The City's potential municipal liability under Monell is addressed

13  separately.

14      A.   A Genuine Dispute of Material Fact Exists as to Whether Piercy's Pat-Down
             Search of Plaintiff Was Reasonable Under the Fourth Amendment
15

16          The City first contends that Piercy's pat-down search of plaintiff was objectively

17  reasonable as a matter of law and that, therefore, plaintiff suffered no violation of her Fourth

18  Amendment rights to be free from unreasonable searches or seizures.  (See City's Memo. at 4-5.)

19  Plaintiff opposes the City's argument regarding the reasonableness of the pat-down search itself,

20  but additionally suggests that Piercy had only a pretextual basis for stopping plaintiff's vehicle

21  and had no legitimate basis to order plaintiff out of her vehicle.  (See Pl.'s Opp'n at 8.)  Before

22  addressing the manner of the search itself, the court first addresses plaintiff's arguments

23  regarding Piercy's stop of plaintiff's vehicle and Piercy's removal of plaintiff from the vehicle.  It

24  also addresses whether Piercy violated plaintiff's constitutional rights by conducting a pat-down

25  search of plaintiff at all, irrespective of the manner of the search.

26  ////

1.      Piercy Lawfully Stopped Plaintiff's Vehicle

Plaintiff first thinly suggests that Piercy violated plaintiff's constitutional rights by stopping her vehicle.  Her written opposition states: "Murillo may or may not have stopped over the limit line.  However, PIERCY stopped her as a pretense to conduct his illegal search of her person."  (Pl.'s Opp'n at 8.)  At the hearing, plaintiff's counsel argued that a genuine dispute of material fact exists as to whether the stopping of plaintiff's vehicle was constitutional, but conceded that Piercy believed that a traffic violation had occurred.  Plaintiff's argument, which even concedes that plaintiff might have committed a traffic infraction, lacks merit.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."[15] United States v. Willis, 431 F.3d 709, 714 (9th Cir. 2005) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted).  Such an investigatory stop is justified where a law enforcement officer has a "reasonable suspicion" that criminal activity may be afoot.  Arvizu, 534 U.S. at 273.  "The 'touchstone of the Fourth Amendment is reasonableness.'"  Willis, 431 F.3d at 714 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)).  "To constitute reasonable suspicion, the officer's belief that criminal activity is afoot must be supported by 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.'"  United States v. Drake, 543 F.3d 1080, 1088 (9th Cir. 2008) (modification in original) (quoting Terry, 392 U.S. at 21).  In determining whether a reasonable suspicion exists, the court "must look at the 'totality of the

---

[15] The parties do not dispute that plaintiff was "seized" within the meaning of the Fourth Amendment.  See Brendalin v. California, 551 U.S. 249, 255 (2007) ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'") (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)); accord United States v. Choudry, 461 F.3d 1097, 1100 (9th Cir. 2006) (stating that an officer's investigatory stop of a person's vehicle implicates the Fourth Amendment "'because stopping an automobile and detaining its occupants constitute a seizure . . . even though the purpose of the stop is limited and the resulting detention quite brief.'") (quoting Prouse, 440 U.S. at 653), cert. denied, 549 U.S. 1236 (2007).

1  circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis'

2  for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273; accord United States v. Palos-

3  Marquez, 591 F.3d 1272, 1274-75 (9th Cir. 2010) ("To determine whether a stop was supported

4  by reasonable suspicion, we consider whether, in light of the totality of the circumstances, the

5  officer had a particularized and objective basis for suspecting the particular person stopped of

6  criminal activity" (citation and quotation marks omitted)), cert. denied, 131 S. Ct. 339 (2010).

7  Although an officer's mere "hunch" is insufficient to justify a stop, the assessment of reasonable

8  suspicion permits an officer to "draw on [his or her] own experience and specialized training to

9  make inferences from and deductions about the cumulative information available to [him or her]

10  that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273-74 (citation omitted). "A

11  traffic violation alone is sufficient to establish reasonable suspicion." Choudry, 461 F.3d at 1100

12  (citing Whren v. United States, 517 U.S. 806, 810 (1996)).

13         Here, Officer Piercy articulated a reasonable suspicion that justified stopping

14  plaintiff's vehicle as a matter of law. Piercy testified that he stopped plaintiff for passing over

15  the limit line when she stopped at the stop sign and turned right, and plaintiff testified that this

16  was the reason for the traffic stop provided to her by Piercy. (Piercy Depo. at 7:23-8:1; Murillo

17  Depo. at 105:9-14, 244:15-22.) The video recording is consistent with Piercy's testimony.

18  Accordingly, Piercy had probable cause to believe that plaintiff had committed a traffic violation,

19  and Piercy reasonably stopped plaintiff's vehicle. See Whren, 517 U.S. at 810 ("As a general

20  matter, the decision to stop an automobile is reasonable where the police have probable cause to

21  believe that a traffic violation has occurred."); Choudry, 461 F.3d at 1100-01 (holding that a

22  parking violation justified an investigatory stop); see also Willis, 431 F.3d at 715 ("Whren stands

23  for the proposition that if the officers have probable cause to believe that a traffic violation

24  occurred, the officers may conduct a traffic stop even if the stop serves some other purpose.").

25  The City and Piercy are entitled to judgment as a matter of law to the extent plaintiff claims that

26  the stopping of her vehicle, itself, was unconstitutional.

2.   Piercy Lawfully Ordered Plaintiff Out of Her Vehicle

Next, plaintiff contends that Piercy impermissibly ordered plaintiff out of her vehicle.  (Pl.'s Opp'n at 8 ("There was no basis for having MURILLO exit her vehicle.").)  At the hearing, the court asked plaintiff's counsel what legal authority supported plaintiff's contention that Piercy violated her constitutional rights by ordering her out of the vehicle.  Plaintiff offered no authority; plaintiff's written opposition also offered no such authority.

Plaintiff's argument fails as a matter of law.  The United States Supreme Court has plainly held that a law enforcement officer may "as a matter of course" order the driver and passengers of a lawfully stopped car to exit the vehicle.  Maryland v. Wilson, 519 U.S. 408, 410 (1997) (holding that a police officer may "as a matter of course" the passengers of a lawfully stopped car to exit the vehicle); Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) ("We hold . . . that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); see also Arizona v. Johnson, 129 S. Ct. 781, 786 (2009) (discussing the holdings of Mimms and Wilson).  Because Piercy lawfully stopped plaintiff's vehicle for a traffic violation, no Fourth Amendment violation occurred when Piercy ordered plaintiff out of her vehicle.  The City and Piercy are entitled to partial summary judgment to the extent that plaintiff argues that Piercy violated plaintiff's constitutional rights when Piercy ordered plaintiff out of the vehicle.

3.   A Genuine Dispute of Material Fact Exists Regarding Whether Piercy's Pat-Down Search of Plaintiff Was Supported By A Reasonable Suspicion that Plaintiff Was Or Might Be Armed and Dangerous

Although Piercy permissibly stopped plaintiff's vehicle and ordered plaintiff out of the vehicle as a matter of law, a far closer question is presented by plaintiff's contention that "[t]here was no basis to believe that MURILLO was an armed and or [sic] dangerous person as required by law to do a patdown search."  (Pl.'s Opp'n at 8; see also id. at 9.)  The court concludes that, at a minimum, a genuine dispute of material fact exists as to whether Piercy

22

1    violated plaintiff's Fourth Amendment rights by conducting a pat-down search of plaintiff at all.

2              "To justify a patdown of the driver or a passenger during a traffic stop . . . , just as

3    in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor

4    reasonable suspicion that the person subjected to the frisk is armed and dangerous."[16]  Johnson,

5    129 S. Ct. at 784; see also United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009) ("If an

6    officer reasonably suspects the individual may be armed and dangerous, the officer may 'frisk'

7    the person he has stopped to determine if the individual is carrying any weapons."); accord

8    Ramirez v. City of Buena Park, 560 F.3d 1012, 1021 (9th Cir. 2009) ("Under the Fourth

9    Amendment, a search for weapons is permissible 'for the protection of the police officer, where

10   he has reason to believe that he is dealing with an armed and dangerous individual.'") (quoting

11   Terry, 392 U.S. at 27).  "This frisk is limited to a patdown of the exterior clothing." Johnson,

12   581 F.3d at 999.

13             To determine whether reasonable suspicion existed to support a pat-down search

14   in the context of a lawful investigatory stop, the court considers the totality of the circumstances

15   surrounding the stop.  Id.; accord United States v. Burkett, 612 F.3d 1103, 1107 (9th Cir. 2010).

16   The Ninth Circuit Court of Appeals has stated that "[a] wide variety of factors support a

17   reasonable belief that an individual is armed and dangerous," including "an officer's observation

18   of a visible bulge in an individual's clothing; sudden movements or repeated attempts to reach

19   for an object not immediately visible; and the nature of the suspected crime.  However, facts

20   merely establishing that *if* an individual were armed he would be dangerous are insufficient if

21   there was no reason to believe that the individual actually *was* armed." Ramirez, 560 F.3d at

22   1022 (citations omitted).

23

24        [16]  The scope of the Terry pat-down or frisk exception to the probable cause requirement
     is "narrow."  See Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979) ("Nothing in *Terry* can be
25   understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever
     for anything but weapons.  The 'narrow scope' of the *Terry* exception does not permit a frisk for
26   weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . .").

Here, Piercy lacked a reasonable suspicion that plaintiff was, or even might be, armed and dangerous.  In its motion, the City supports Piercy's pat-down search with generalized concerns about "officer safety."  (See City's Memo. at 4-5.)  In part, the City relies on: (1) the general risks an officer faces during a traffic stop, especially a nighttime traffic stop; (2) disputed statistics regarding the number of assaults committed against sworn peace officers in Woodland in 2007 and 2008; and (3) two anecdotal murders of peace officers in Yolo and Sacramento Counties in 2006 and 2008, respectively, that are not substantiated by admissible evidence.  (Id.)  The City further argues:

> When Piercy conducted the traffic stop of the Plaintiff he was working as a solo officer.  The stop occurred after midnight in a dimly lit, commercial area.  Given the legitimate concerns for officer safety, it was not unreasonable for Piercy to conduct a cursory pat down of Plaintiff for weapons after she exited the car, prior to commencing his Driving Under the Influence investigation.

(Id.)

Nothing in the City's argument suggests, let alone substantiates, that Piercy had a reasonable suspicion that *plaintiff* was, or even might be, armed and dangerous.  The City only offers generalized concerns about officer safety, the time of night at which the traffic stop occurred, and the lighting in the area as reasons for Piercy's pat-down search of plaintiff.  The Ninth Circuit Court of Appeals has rejected such attempts to justify pat-down searches or frisks on the basis of "a conclusory reference to officer safety."  See Ramirez, 560 F.3d at 1022.

In Ramirez v. City of Buena Park, the Court of Appeals held that an officer lacked a reasonable suspicion that justified any pat-down search of a motorist for weapons.  Id.  There, a police officer, Officer Montez, noticed a convertible car parked outside of a drugstore just after 8:00 p.m., with the appellant, Ramirez, reclined in his seat and asleep behind the wheel.  See id. at 1016.  Officer Montez decided to investigate further because of his knowledge that "several grab-and-run type thefts" of alcohol had occurred at that location and that getaway vehicles had been used in those thefts.  Id.  The car's parking lights were on, and the keys were in the ignition.

Id. at 1016-17.  Additionally, Officer Montez noticed that Ramirez was breathing rapidly, which, based on Officer Montez's specialized training, suggested that Ramirez might be under the influence.  See id.  Officer Montez subsequently ordered Ramirez out of his vehicle, conducted a pat-down search of Ramirez's outer clothing without Ramirez's consent, and arrested Ramirez for being under the influence of a controlled substance.  See id. at 1018.  Although the Court of Appeals held that Officer Montez was justified in detaining Ramirez, see id. at 1020-21, it rejected Officer Montez's justification for the pat-down search of Ramirez and held that the pat-down search violated the Fourth Amendment.  Id. at 1022.  In finding a constitutional violation, the Court of Appeals reasoned:

> Montez's only justification for the pat-down search of Ramirez is a conclusory reference to "officer safety."  Montez has not alleged any specific facts that would establish reasonable suspicion that Ramirez was armed and dangerous.  On the contrary, Ramirez was cooperative.  He complied with Montez's request that he exit his vehicle, and there is no evidence he did so in a furtive manner.  There is nothing in the record to suggest Ramirez made any abrupt movements or that he attempted to reach for anything upon exiting his vehicle.  He also cooperatively submitted to the search of his person, albeit without his consent.  Montez testified that he tapped Ramirez's outer garments "to make sure" there were no bulges or weapons concealed, but does not allege that he observed a visible bulge or weapon on Ramirez.  Unless an officer can point to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk.

Id. (citations omitted).  The Court of Appeals further stated that "being 'testy' and suspected of illicit drug use does not support a finding that Ramirez had a weapon."  Id.

Plaintiff's case is analogous to Ramirez, except that Piercy had even less of a basis to conduct a pat-down search of plaintiff than Officer Montez had to search Ramirez.  The City argues that Piercy had a reasonable suspicion to conduct a pat-down search of plaintiff because of the time of night when the traffic stop occurred, the location of the stop, and conclusory references to officer safety.  These justifications, alone, are insufficient to justify the pat-down search under Ramirez.  Moreover, as in Ramirez, plaintiff was cooperative and responsive to Piercy's requests.  She exited her vehicle without any furtive movements and

cooperatively submitted to the search of her person, even though she provided no consent to the

search and felt that she was being violated by Piercy.  And unlike Ramirez, there is no suggestion

that plaintiff was "testy" or suspected of drug use, neither of which would have, in any event,

constituted a legitimate, reasonable suspicion that plaintiff was armed and dangerous.  In short,

Piercy had no basis to conduct a pat-down search of plaintiff, and the City has not persuasively

articulated any such basis.

        The fact that the City and Piercy have not articulated a reasonable suspicion in

support of the pat-down search is not surprising in light of Piercy's deposition testimony, which

reflects that Piercy routinely searched *any* person he ordered out of a vehicle.  Piercy testified as

follows:

> Q.  Every time -- was it your routine in January of '09 to do a weapon
> search every time you stopped somebody for suspected drunk driving?
>
> A.  If I pulled them out of the vehicle, yes.
>
> Q.  Okay.  So man or woman, didn't matter, you would always search
> them; is that right?
>
> A.  Yes.
>
> Q.  And it didn't matter what kind of clothes they had on, tight clothes or
> baggy clothes, you would still search them; right?
>
> A.  Well, if they were wearing a dress, clearly I'm not going to search the
> bottom.  But if it was fully clothed jeans or shirt or anything, then yes, I
> would.

(Piercy Depo. at 24:4-16.)  Piercy further testified:

> Q.  Does the cooperation of the driver during a suspected DUI stop make
> any difference in determining whether you're going to do a patdown
> search or not?
>
> A. I'd say most of the time no.
>
> Q.  So the fact that the driver was not -- did not appear threatening or
> verbally confrontational or resistive, it makes no differences in whether
> you do a search; is that right?
>
> A. Yes.

> Q.  If a driver is wearing baggy clothing, would that make you more likely to do a search on the driver?
>
> A. No, as I just stated, I would do it anyway because usually my practice was that, if I pulled somebody out of the vehicle, I would search them.  So whether they had baggy clothes on or form-fitting clothes on, I would still do it and conduct a search.

(Piercy Depo. at 99:10-25.)  Additionally, Piercy testified that while observing plaintiff as plaintiff walked from her vehicle to the sidewalk, Piercy did not observe any: (1) suspicious behavior on plaintiff's part that tended to indicate that plaintiff was concealing a weapon; (2) bulges in any plaintiff's clothing that appeared to be a weapon, although Piercy testified it was difficult to see at night even though his headlights were pointed at plaintiff; and (3) movement of plaintiff's hands suggesting that plaintiff was reaching in her pockets or for a weapon or an object that could hurt him.  (See Piercy Depo. at 111:1-112:20.)

In light of the facts stated above and the standard set forth in Ramirez, the court concludes that, at a minimum, a triable issue of material fact exists as to whether Piercy violated plaintiff's Fourth Amendment rights by conducting any pat-down search of plaintiff, regardless of the manner of the search.  Accordingly, Piercy's motion for partial summary judgment is denied as to this claim.  However, whether the City's motion ultimately succeeds depends on the resolution of whether the City's policy, practice, or custom was the moving force behind the violation.  That issue is addressed below.

4.  A Genuine Dispute of Material Fact Exists Regarding Whether The Manner In Which Piercy Searched Plaintiff Violated Plaintiff's Constitutional Rights

As stated above, a genuine dispute of material fact exists regarding whether Piercy violated plaintiff's Fourth Amendment rights by conducting a pat-down search at all.  However, plaintiff also contends that the manner in which Piercy searched plaintiff violated plaintiff's Fourth Amendment rights.  (Pl.'s Opp'n at 9-10.)

As noted above, a Terry "frisk is limited to a patdown of the exterior clothing."  Johnson, 581 F.3d at 999.  "Such a search . . . 'must be strictly limited to that which is necessary

27

1    for the discovery of weapons which might be used to harm the officer or others nearby.'" United

2    States v. Hartz, 458 F.3d 1011, 1018 (9th Cir. 2006) (quotation marks omitted) (quoting

3    Minnesota v. Dickerson, 508 U.S. 366, 373 (1993)).  "If the protective search goes beyond what

4    is necessary to determine if the suspect is armed, it is no longer valid under Terry."  Dickerson,

5    508 U.S. at 373.

6           Briefly stated, if Piercy had no lawful basis to conduct a pat-down search of

7    plaintiff in the first place, then the manner in which Piercy searched plaintiff was necessarily

8    unconstitutional.  Because the undersigned concludes that a genuine dispute of material fact

9    exists regarding whether Piercy had a proper basis to conduct a pat-down search, a genuine

10   dispute of material fact also exists as to the manner of the search.  Accordingly, Piercy's motion

11   for partial summary judgment is denied.

12          However, whether the City is municipally liable for the manner of Piercy's pat-

13   down search of plaintiff depends on whether a policy, practice, or custom of the City was the

14   moving force behind this additional constitutional violation.  That issue is addressed below.

15   Before reaching the issue of the City's potential liability under Monell, the undersigned addresses

16   the City's and Piercy's motions for partial summary judgment as to two additional, alleged

17   constitutional injuries.

18        B.    The City Is Entitled to Partial Summary Judgment to the Extent that Plaintiff
              Alleges that Piercy's Pat-Down Search of Plaintiff Constituted Excessive Force
19            Under the Fourth Amendment

20          The City contends that Piercy's pat-down search of plaintiff did not constitute

21   excessive force under the Fourth Amendment.  (City's Memo. at 6-7.)  As to Piercy, plaintiff's

22   First Amended Complaint alleges that Piercy "unlawfully and wrongfully assaulted plaintiff in a

23   sexual manner and applied physical force to her person in violation of the Fourth Amendment."

24   (First Am. Compl. ¶ 10.)  As to the City, plaintiff alleges that the City violated her constitutional

25   rights by "failing to educate and train its police officers, including PIERCY, in the proper use of

26   force against detainees and to avoid offensive contact during a pat down search by an officer of

28

1   the opposite gender."  (Id. ¶ 19.)  Plaintiff's operative complaint arguably alleges a claim for

2   excessive force, but it is not entirely clear.

3           "Allegations of excessive force are examined under the Fourth Amendment's

4   prohibition on unreasonable seizures."  Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010)

5   (citing, inter alia, Graham v. Connor, 490 U.S. 386, 394 (1989)).  All claims that law

6   enforcement officers used excessive force in the course of an arrest, investigatory stop, or other

7   seizure are analyzed exclusively under the Fourth Amendment's "reasonableness" standard.  See

8   Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007); accord Smith v. City of Hemet,

9   394 F. 3d 689, 700 (9th Cir. 2005) (en banc), cert. denied, 545 U.S. 1128 (2005).  "That analysis

10  requires balancing the 'nature and quality of the intrusion' on a person's liberty with the

11  'countervailing governmental interests at stake' to determine whether the use of force was

12  objectively reasonable under the circumstances."  Smith, 394 F.3d at 701 (citing Graham, 490

13  U.S. at 396).

14          Plaintiff's written opposition to the City's motion does not oppose or even address

15  the City's argument that no genuine dispute of material fact exists insofar as plaintiff's potential

16  excessive force claim is concerned and that, as a result, the City is entitled to judgment as a

17  matter of law on that claim.  In light of plaintiff's failure to oppose the City's motion in this

18  respect or offer evidence in support of such a claim, the court grants partial summary judgment to

19  the City to the extent that plaintiff alleges that Piercy's pat-down search constituted excessive

20  force in violation of plaintiff's Fourth Amendment rights.

21      C.      The City Is Entitled to Partial Summary Judgment to the Extent that Plaintiff
                Alleges A Violation of Her Substantive Due Process Rights Under the Fourteenth
22              Amendment

23          The City also moves for partial summary judgment to the extent that plaintiff

24  alleges a violation of her substantive due process rights provided by the Fourteenth Amendment

25  to the United States Constitution.  (See City's Memo. at 7-8.)  Plaintiff's First Amended

26  Complaint alleges that Piercy's pat-down search of plaintiff violated plaintiff's rights provided

29

1   by the Fourth and Fourteenth Amendments.  (See First Am. Compl. ¶¶ 15, 22.)  She specifically

2   alleges that the City's "custom, practice or policy of not educating and training its police officers

3   as alleged shocks the conscience and violates plaintiff's right to be free from unreasonable search

4   and seizure and to have due process as guaranteed by the Fourth and applied to the states under

5   the Fourteenth Amendment to the United States Constitution."  (Id. ¶ 22.)

6          The City contends that Piercy's "brief touching of Plaintiff's buttocks and legs

7   during the course of a pat down is not a conscience shocking 'sexual assault' under the

8   Fourteenth Amendment."  (City's Memo. at 7.)  The Ninth Circuit Court of Appeals has held in

9   the context of a Section 1983 claim against a law enforcement officer that "only official conduct

10  that 'shocks the conscience' is cognizable as a due process violation."  Porter v. Osborn, 546

11  F.3d 1131, 1137 (9th Cir. 2008) (citing County of Sacramento v. Lewis, 523 U.S. 833, 846

12  (1998)); accord A.D. v. Markgraf, 636 F.3d 555, 560 (9th Cir. 2011).  Plaintiff's written

13  opposition to the City's motion does not oppose or address the City's argument that no genuine

14  dispute of material fact exists insofar as plaintiff's substantive due process claim is concerned

15  and that, as a result, the City is entitled to judgment as a matter of law on that claim.

16  Accordingly, the court grants partial summary judgment to the City on plaintiff's substantive due

17  process claim.

18          D.      A Genuine Dispute of Material Fact Exists Regarding the City's Liability Under
                    Monell
19

20          The City argues that even if a genuine dispute of material fact exists as to whether

21  Piercy's pat-down search violated plaintiff's constitutional rights, plaintiff's Section 1983 claim

22  against the City fails as a matter of law because plaintiff cannot show that a policy, practice, or

23  custom of the City caused any such constitutional violation.  (City's Memo. at 8.)  Adopting an

24  unfocused, shotgun approach, plaintiff counters by alleging a slough of proposed policies, acts of

25  omission, and assertions of inadequate training.  (See Pl.'s Opp'n at 10-12.)  She further argues

26  that the City is liable because the City ratified, or acquiesced in, Piercy's conduct.  (Id. at 12-13.)

1        Although the court concludes that all of the plaintiff's arguments are unpersuasive

2   and grants partial summary judgment to the City in regards to plaintiff's claim that the *manner* in

3   which Piercy searched plaintiff was unconstitutional, summary judgment is nonetheless improper

4   as to plaintiff's contention that Piercy violated plaintiff's constitutional rights by conducting a

5   pat-down search at all.  In short, a genuine dispute of material fact exists regarding the nature of

6   the City's policies, practices, and customs dictating *when* an officer of the Woodland Police

7   Department is permitted to conduct a pat-down search.

8           1.      The City's and/or the Woodland Police Department's Policies, Practices,
                    Customs, and Training
9

10       Between plaintiff's First Amended Complaint and opposition to the motions for

11   partial summary judgment, plaintiff asserts that several policies, practices, or customs caused

12   Piercy's unconstitutional pat-down search of plaintiff.  In the First Amended Complaint, plaintiff

13   alleges that the City is liable based on policies of: (1) "failing to educate and train [the City's]

14   police officers, including PIERCY, in the proper use of force against detainees and to avoid

15   offensive contact during a pat down search by an officer of the opposite gender"; and (2) "failing

16   to budget enough funds to provide [the City's] police officers with training and education in the

17   proper use of force against detainees and to avoid offensive contact during a pat down search by

18   an officer of the opposite gender."  (First Am. Compl. ¶¶ 19, 21.)  Plaintiff's opposition brief

19   alleges the following, additional bases for the City's municipal liability: (3) the City's

20   generalized policy of "tolerating and condoning the pat-down search of persons on routine traffic

21   stops," and not only when consistent with the law (Pl.'s Opp'n at 10-11); (4) inadequate training

22   manifested through a lack of "written guidelines" requiring the City's officers to use the back and

23   blade of the hand, rather than the palm, when searching persons of the opposite sex (id. at 11);

24   (5) inadequate training in the form of a lack of a policy against officers listening to civilian radio,

25   which allegedly led Piercy to feel "less professional and more like he was trolling for women to

26   stop and search" (id. at 11-12); and (6) the City's lack of a "policy in place to monitor and review

                                              31

1   the video tapes of stops performed by new officers who were still on probation," which "hindered

2   the training process" (id. at 12).

3          The court summarily concludes that no genuine dispute of material fact exists as

4   to whether an alleged policy of failing to budget funds for training and education in the proper

5   use of force against detainees exists and led to the constitutional violations here.  Plaintiff

6   identifies no express policy of under-funding training programs, and similarly points to no

7   evidence that remotely suggests that the City's purported failure to budget funds to support

8   training programs led to Piercy's unconstitutional conduct.

9          The court further concludes that the City is entitled to partial summary judgment

10  to the extent that plaintiff contends that inadequate training led to the constitutional violations

11  here.  Specifically, plaintiff has not created a genuine dispute of material fact in regards to her

12  allegations that the Woodland Police Department had an inadequate training program due to the

13  lack of: (a) "written guidelines" requiring the City's officers to use the back and blade of the

14  hand, rather than the palm, when searching persons of the opposite sex; (b) a policy against

15  officers listening to civilian radio; and (c) a "policy in place to monitor and review the video

16  tapes of stops performed by new officers who were still on probation."  (See Pl.'s Opp'n at 11-

17  12.)

18          "[U]nder certain circumstances, a local government may be held liable under

19  § 1983 for acts of 'omission,' when such omissions amount to the local government's own

20  official policy."  Clouthier, 591 F.3d at 1249.  "A municipality's culpability for a deprivation of

21  rights is at its most tenuous where a claim turns on a failure to train."  Connick v. Thompson,

22  131 S. Ct. 1350, 1359 (2011).  "The 'inadequacy of police training may serve as the basis for

23  § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of

24  persons with whom the police come into contact.'"  Price, 513 F.3d at 973 (quoting City of

25  Canton v. Harris, 489 U.S. 378, 388 (1989)); see also Clouthier, 591 F.3d at 1249 ("To impose

26  liability on a local government for failure to adequately train its employees, the government's

1   omission must amount to 'deliberate indifference' to a constitutional right.").  "This standard is

2   met when 'the need for more or different training is so obvious, and the inadequacy so likely to

3   result in the violation of constitutional rights, that the policymakers of the city can reasonably be

4   said to have been deliberately indifferent to the need.'"  Clouthier, 591 F.3d at 1249 (citing

5   Harris, 489 U.S. at 390).  "Under Harris and progeny, one must demonstrate a 'conscious' or

6   'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim."

7   Id. (citing Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007)).

8           Plaintiff's contention that the City's or the Woodland Police Department's

9   training on the manner of conducting a Terry pat-down search was inadequate fails as a matter of

10  law.  Plaintiff's objection to the manner in which Piercy searched plaintiff is that Piercy used the

11  palm of his hand to search plaintiff rather than the back and blade of his hand.  Here, the City

12  offered evidence that during its orientation and field training programs, officers are trained on

13  "how to conduct pat down searches."  (Cucchi Decl. ¶ 4.)  Moreover, the City offered evidence

14  that "Woodland Police Department officers are trained to use the back and blade of the hand

15  when searching females' breast and buttock areas."  (Id. ¶ 5.)  Specifically, the City's evidence

16  reflects that "when an officer searches the area under the breasts, the blade section of the hand

17  (fingers up, thumb against the body) sweeps along the bra line and the back of the hand is used

18  on the buttocks."  (Id.)  The City submitted that these facts regarding the Woodland Police

19  Department's training are undisputed, and plaintiff failed to identify evidence that creates a

20  genuine dispute of material fact regarding the City's training.  (Compare City's SUF ¶¶ 7-8, with

21  Pl.'s SDF ¶¶ 7-8 (stating only that "[n]o written manual was ever produced on this issue").)

22  Plaintiff's contention that the Woodland Police Department lacked a written policy in this regard

23  does not create a genuine dispute of material fact; the City identified undisputed evidence of its

24  training policy, and plaintiff failed to rebut that evidence with any of her own.  At bottom,

25  plaintiff relies only on Piercy's individualized conduct to substantiate her claim of inadequate

26  training and identifies no instances where other officers conducted pat-down searches of females

33

1   in derogation of the department's training such that the need for more or different training would

2   have been obvious to the Woodland Police Department or the City.  See Connick, 131 S. Ct. at

3   1360 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily

4   necessary' to demonstrate deliberate indifference for purposes of failure to train.").  Accordingly,

5   the City is entitled to partial summary judgment to the extent that plaintiff claims that the City is

6   liable under Monell for the unconstitutional manner in which Piercy conducted the pat-down

7   search of plaintiff.

8          The court also rejects plaintiff's claim of inadequate training premised on the

9   City's or the Woodland Police Department's lack of a policy against officers listening to civilian

10  radio.  Although plaintiff points to deposition testimony substantiating a department practice that

11  permits officers to listen to civilian radio while on patrol (see Cucchi Depo. at 46:22-25–47:1-7,

12  49:4-7), she points to no evidence that this policy was the moving force behind the

13  unconstitutional search of plaintiff.  Moreover, under the stringent standards governing claims of

14  inadequate training, plaintiff has identified no evidence that the need for different training vis-a-

15  vis the use of civilian radio by patrol officers was so obvious, and the purported inadequacy was

16  so likely to result in the violation of constitutional rights, that the lack of a policy against

17  listening to civilian radio amounted to deliberate indifference to the need for different training.

18         Additionally, the City is also entitled to partial summary judgment as to plaintiff's

19  claim that inadequate training resulted from a lack of a policy requiring the review of video

20  recordings of traffic stops and searches conducted by probationary officers.  Again, plaintiff

21  relies only on Piercy's conduct to substantiate this aspect of her claim of inadequate training, and

22  identifies no evidence that substantiates that the failure to have a policy addressed to reviewing

23  video recordings was so obvious, and the purported inadequacy was so likely to result in the

24  violation of constitutional rights, that the lack of a video review policy amounted to deliberate

25  indifference.

26         The court concludes, however, that a genuine dispute of material fact exists in

34

1    regards to whether the City or the Woodland Police Department had a policy, practice, or custom

2    that authorized patrol officers to conduct a pat-down search of a motorist seized during a traffic

3    stop without a reasonable suspicion that the motorist is or might be armed and dangerous.  This

4    conclusion impacts the City's liability in that Piercy searched plaintiff without a constitutional

5    basis to do so, but it does not create liability for the City insofar as the manner of the search is

6    concerned because, as discussed above, it is undisputed that the Woodland Police Department

7    had a policy of training its officers *how* to properly conduct a pat-down search.

8            Plaintiff's opposition brief asserts that the Woodland Police Department had a

9    purported policy, practice, or custom of "tolerating and condoning the pat-down search of

10   persons on routine traffic stops," and not only when consistent with Terry.  (See Pl.'s Opp'n at

11   10-11.)  As an initial matter, the court rejects plaintiff's evidentiary basis for this argument.

12   Plaintiff only relies on the conclusory declaration of her expert, David A. Dusenbery, which

13   states:

14          The Woodland Police Department tolerated and condoned the pat-down
             search of persons on routine traffic stops.  That is a very poor and illegal
15          practice.  The department should have required officers to do pat-down
             searches only when consistent with the law.
16

17   (Dusenbery Decl. at 3.)  Dusenbery offers no factual basis or explanation for his conclusion and,

18   accordingly, his declaration does not create a genuine dispute of material fact that precludes the

19   grant of partial summary judgment.  See Clouthier, 591 F.3d at 1252; Soremekun, 509 F.3d

20   at 984.  Indeed, Dusenbery's expert declaration plays no part in the court's determination.

21           However, and in a somewhat peculiar twist, the City's own evidence and

22   statement of undisputed facts creates a genuine dispute of material fact here.  Specifically, and as

23   discussed at length during the hearing, the City proposed the following undisputed fact: "For the

24   safety of the Officer, the decision to do a pat down search during a traffic stop is at their

25   ////

26   ////

discretion."[17]  (City's SUF ¶ 12.)  As the basis for this fact, the City cites Lieutenant Cucchi's

declaration, which contains a nearly identical statement: "For the safety of the officer, the

decision to do a pat down search during a traffic stop is at their discretion."  (Cucchi Decl. ¶ 9.)

The court's concern is that a reasonable jury could conclude on the basis of this fact that the

Woodland Police Department has or had an official policy, practice, or custom of permitting,

condoning, or instructing its officers to conduct Terry pat-down searches of motorists during

routine traffic stops, regardless of the legal requirement from Terry and its progeny that an officer

have a reasonable suspicion that the individual is armed and dangerous in order to conduct such a

pat-down search.  Lieutenant Cucchi's statement indicates that an officer may, in his or her

"discretion," conduct a pat-down search simply when he or she is concerned about officer safety.

As discussed at length above, this is not the proper legal standard; general concerns about

"officer safety" alone do not support a pat-down search under Terry.  Moreover, Lieutenant

Cucchi's declaration and deposition testimony do not clarify the meaning, contours, or

boundaries the phrases "[f]or the safety of the officer" and "at their discretion" provided in his

declaration.  Similarly, the deposition testimony of Lieutenant Wilts and retired Chief Sullivan

do not clarify Lieutenant Cucchi's statements or precisely state what the Woodland Police

Department's policies, practices, or customs were in regards to *when* it was appropriate for an

officer to conduct a Terry pat-down search.  Accordingly, the undersigned denies the City's

motion for summary judgment to the extent that the City's Monell liability is premised on

Piercy's pat-down search of plaintiff without a reasonable suspicion that plaintiff was armed and

dangerous.

At the hearing, the City argued that it is nonetheless entitled to partial summary

judgment because, in its view, plaintiff's First Amended Complaint does not allege that the City

---

[17]  Plaintiff disputed this statement of fact on the grounds that it "is contrary to law,"
citing Terry.  (Pl.'s SDF ¶ 12.)  In terms of evidence, plaintiff disputed this fact only on the basis
of Dusenbery's conclusory expert declaration, to which the court gives no weight.  (Id.)

1    or the Woodland Police Department had a policy, practice, or custom of permitting officers to

2    conduct pat-down searches of motorists during routine traffic stops without a reasonable

3    suspicion that the motorist was armed and dangerous.  The City contends that, as a result, it was

4    unaware of plaintiff's claim in this regard when it prepared its motion for partial summary

5    judgment.  Without a doubt, plaintiff's First Amended Complaint is hardly a model of clarity.

6    However, the court concludes that the allegations in the First Amended Complaint are sufficient,

7    even if only barely, to have put the City on notice of plaintiff's theory of Monell liability.  The

8    First Amended Complaint alleges that the City is liable for "failing to educate and train its police

9    officers, including PIERCY, in the proper use of force against detainees and to avoid offensive

10   contact during a pat down search by an officer of the opposite gender."  (First Am. Compl. ¶ 19.)

11   Additionally, even if plaintiff's First Amended Complaint is ambiguous, plaintiff's opposition

12   brief put the City on notice of plaintiff's theory of Monell liability as it pertains to when officers

13   may conduct pat-down searches.  It states:

14            The constitutional deprivation resulting from actions taken pursuant to
              government policy or custom in this case relate to The [*sic*] Woodland
15            Police Department tolerating and condoning the pat-down search of
              persons on routine traffic stops. . . .  The department should have required
16            officers to do pat-down searches only when consistent with the law . . . .
              WOODLAND's municipal liability is based on a custom and or policy
17            which violated *Terry*.

18   (Pl.'s Opp'n at 10-11.)  Despite this language, the City raised no objection to this theory of

19   Monell liability in its reply brief.  Furthermore, the City framed the question of when an officer

20   may conduct a Terry pat-down search as a material fact in its statement of undisputed facts.  (See

21   City's SUF ¶ 12.)  In any event, as plaintiff's counsel argued at the hearing, plaintiff would very

22   likely be permitted to further amend her pleading to conform to the evidence presented on the

23   motion for partial summary judgment.  See, e.g., Grisham v. Philip Morris, Inc., 670 F. Supp. 2d

24   1014, 1022-23 (C.D. Cal. 2009) (constructively amending complaint based on evidence adduced

25   in the context of a motion for summary judgment); see also Kaplan v. Rose, 49 F.3d 1363, 1370

26   (9th Cir. 1994) ("An addition of new issues during the pendency of a summary judgment motion

1    can be treated as a motion for leave to amend the complaint."), cert. denied, 516 U.S. 810 (1995).

2    Accordingly, the court rejects the City's argument premised on the adequacy of notice provided

3    by the First Amended Complaint.

4    During the hearing, the court also provided the City's counsel with an opportunity

5    to review the record during a recess and provide citations to evidence in the record, including the

6    lodged deposition testimony, that clarifies Lieutenant Cucchi's statement of the Woodland Police

7    Department's policies, practices, or customs regarding when an officer may conduct pat-down

8    searches during a routine traffic stop.  The City's counsel cited to several pieces of evidence,

9    which are addressed in turn below.

10   First, the City notes that Piercy received training on pat-down searches at the

11   Butte College Police Academy, consisting of the basic Peace Officer Standards and Training,

12   which would have been reinforced by Piercy's training with the Woodland Police Department.

13   However, the court does not have before it evidence detailing the training provided to Piercy at

14   the Butte College Police Academy.  It is unclear what Piercy's precise academy training was and,

15   therefore, it is unclear what was purportedly enforced by the Woodland Police Department's

16   training.  Furthermore, the City's counsel candidly stated at the hearing there is no specific

17   evidence before the court regarding Piercy's academy training and that she did not believe that

18   Piercy testified during his deposition about his academy training in regards to when it is

19   appropriate to conduct a Terry pat-down search.  Accordingly, this line of argument does not

20   resolve the court's concerns about granting partial summary judgment.

21   Second, the City relies on the deposition testimony of Lieutenant Cucchi

22   describing his concerns that Piercy's searches resembled searches incident to arrest rather than

23   Terry pat-down searches.  Specifically, the City cited the following testimony:

24   A.  We're only looking for weapons from a patdown search and we have
     to have some good reasonable facts behind why we're going to search an
25   area or some sort of suspicion that there would be a weapon there, and I
     never really felt that in some of these.  And to finish answering your
26   question, search incident to an arrest we can search everything because

they're getting in the back of our patrol car and we're got to take them to jail, and that's what kind of struck me odd with his -- with his searches.

Q.  Did you feel it was odd that he was doing searches in the first place on these traffic stops?

A.  No, I didn't think it was odd that he was doing searches.  We want our officers to be safe foremost.  It's just the ones he -- the ones -- when he chose to search I guess would probably be -- or how detailed of a search he did would be what my concern was.

(Cucchi Depo. at 34:3-19.)  Lieutenant Cucchi's testimony clarifies little about the Woodland Police Department's policies regarding when a pat-down search is permitted.  Although Lieutenant Cucchi's testimony describes his criticisms of Piercy's searches and alludes to the Terry standard, it does not clearly address the Woodland Police Department's actual policies, practices, or customs.  Moreover, Lieutenant Cucchi's testimony is in some respects consistent with his declaration in that he testified that it was not odd that Piercy was conducting searches in the first place because "we want our officers to be safe foremost."  Thus, it remains entirely possible that the Woodland Police Department instructed its officers to place general concerns about officer safety ahead of the applicable constitutional standards.

Third, the City relies on a portion of an internal Woodland Police Department memorandum filed by plaintiff under seal in this case, which is stamped CITY00739-CITY00741 and was prepared by Sergeant Heath Parsons.  This memorandum concerns Sergeant Parsons's inquiry about, and discussion with, another female motorist who Piercy had searched and made uncomfortable; that search occurred during the same shift when Piercy searched plaintiff.  The City cites to a portion of the memorandum in which Sergeant Parsons discusses what he told the second motorist about when officers conduct pat-down searches:

I explained to [the motorist] that a pat search of a person is not uncommon when an officer is going to be in close contact with a person (during a field sobriety test for example) and there is reason to believe a weapon may be involved.  In this case, the search was likely performed due to the possibility of intoxication, circumstances of the stop, and her coat covering her waistline. . . .  I explained that as long as he had a good reason to do the search and did it using the proper techniques then there would be no

1    problem with his actions.

2    Sergeant Parsons's memorandum further indicates that Piercy told Sergeant Parsons that Piercy

3    "often pat searches individuals prior to field sobriety tests when he can't visually clear a person

4    for weapons."  However, similar to the other evidence cited by the City, this memorandum does

5    not clarify what the department's policies, practices, and customs are or were in regards to when

6    a part-down search is appropriate such that partial summary judgment would be appropriate.

7    Although it recites one officer's statement of when a pat-down search is "not uncommon," it

8    does not make sufficiently certain the Woodland Police department's policies, practices, and

9    customs.

10              Fourth, the City cites to another portion of Lieutenant Cucchi's deposition, where

11    Lieutenant Cucchi testified regarding whether it would be appropriate to conduct a pat-down

12    search of a woman wearing tight jeans.  He testified:

13            THE WITNESS: Yeah, kind of what I was getting at is the type of
         clothing that the individual is wearing can determine whether or not you
14         search that area for weapons or not.

15          Q.  MR. JANOFF: And if it's tight jeans, how does that make your
         decision?
16
           . . .
17
           A.  I was just going to say when I used to train as a training officer I would
18         always tell my rooks, you know, there is no reason to search something
         that is so obvious there's nothing going to be there, other than the real
19         baggie sweatshirts and jackets or bulge.  That's what we want to make
         sure to look at.
20

21    (Cucchi Depo. at 40:1-16.)  As with the portion of Lieutenant Cucchi's testimony discussed

22    above, this testimony does not clarify Lieutenant Cucchi's declaration insofar as the Woodland

23    Police Department's policies, practices, or customs are concerned.  It simply recounts how

24    Lieutenant Cucchi trained his trainees when he was a training officer in regards to what types of

25    clothing to search during a pat-down.  It does not clarify the policies, practices, or customs

26    regarding when to conduct a <u>Terry</u> pat-down at all.

40

1          Fifth, the City cites to a portion of a "Incident Supplement Report" prepared by

2    Detective Mat Jameson, which was filed under seal and is stamped CITY00661.  The City relies

3    on a statement in the report wherein Detective Parsons recounts Piercy's statement to him.

4    According to the report, Piercy stated that "he would conduct searches of persons when he felt

5    they could be concealing weapons due to the layers of clothing worn or other factors."  However,

6    this statement is merely Piercy's recounting of when he would conduct pat-down searches.

7    Again, it does not clarify the Woodland Police Department's policies, practices, and customs in

8    place regarding when a <u>Terry</u> pat-down search is appropriate.  Moreover, Piercy's statement to

9    Detective Jameson is flatly contradicted by his deposition testimony regarding his routine pat-

10   down searches of motorists that is quoted above.

11          Even considering the evidence cited by the City as a whole, the court cannot

12   conclude that there is an absence of a genuine dispute of material fact regarding the City's or the

13   Woodland Police Department's policies, practices, or customs dictating when a <u>Terry</u> pat-down

14   search is appropriate.  Accordingly, as noted above, the court denies the City's motion for partial

15   summary judgment in part.

16                    2.    <u>Ratification or Acquiescence By the City</u>

17          Although not raised in the First Amended Complaint, plaintiff also contends in

18   her opposition brief that the Woodland Police Department ratified Piercy's conduct or acquiesced

19   in that conduct by promoting Piercy out of field training and advancing Piercy to patrolman

20   status.  (Pl.'s Opp'n at 12-13.)  Plaintiff's argument fails as a matter of law.

21          A local government may be held liable under Section 1983 when an official with

22   final policy-making authority "ratified a subordinate's unconstitutional decision or action and the

23   basis for it."  <u>See</u> <u>Clouthier</u>, 591 F.3d at 1250 (citation and quotation marks omitted).  "There

24   must, however, be evidence of a conscious, affirmative choice on the part of the authorized

25   policymaker."  <u>Id.</u> (citation and quotation marks omitted).

26          Plaintiff relies on evidence filed under seal that reflects that Piercy was

                                              41

1    disrespectful during field training.  For example, this evidence indicates that Piercy generally

2    questioned some of the training methods employed by the department, and also used expletives

3    and other derogatory language when referring to senior officers.  However, plaintiff does not

4    explain how Piercy's promotion to patrolmen in the face of such relative insubordination

5    constitutes a conscious, affirmative choice by a policymaker to ratify or acquiescence in Piercy's

6    *unconstitutional* search of plaintiff.

7            Plaintiff also alleges ratification of, or acquiescence in, Piercy's conduct in that

8    video recordings of traffic stops taken shortly before February 1, 2009, show illegal or

9    inappropriate conduct, but that no action against Piercy was taken until after the stop involving

10   plaintiff.  Again, however, plaintiff points to no evidence that an official with policy-making

11   authority at the Woodland Police Department or the City made a conscious, affirmative choice to

12   ratify Piercy's conduct.  Moreover, the department took action in this case shortly after all of the

13   incidents occurred.  It investigated Piercy's prior traffic stops and ultimately terminated Piercy in

14   June 2009, just months after the stop involving plaintiff.

15           Plaintiff's arguments premised on ratification or acquiescence plainly lack merit.

16   Accordingly, the City is entitled to judgment as a matter of law to the extent that plaintiff's

17   Monell claim is based on the City's or the Woodland Police Department's ratification of, or

18   acquiescence in, Piercy's unconstitutional conduct.

19   IV.   CONCLUSION

20           For the reasons stated above, IT IS HEREBY ORDERED that:

21           1.    Defendant City of Woodland's Motion for Summary Adjudication (Dkt.

22   No. 52) is granted in part and denied in part.

23           2.    Defendant Ryan Piercy's motion for partial summary judgment, by way of

24   partial joinder in the City's Motion for Summary Adjudication (Dkt. No. 62), is granted in part

25   and denied in part.

26   ////

42

1          IT IS SO ORDERED.

2   DATED:  May 23, 2011

3

4                                   _____
                                    KENDALL J. NEWMAN
5                                   UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26